Please rise. This court is now in session. Oh! Sorry. It's late in the day. Please be seated. That was just as bold as it's doing. Oh, you all know. I think it's responsible. Please be seated. Please call the case. 3-16-0214 People of the State of Illinois Appellant by Mark Rostal v. William Atchison's Appellate Court Debate Please proceed. Good afternoon. May it please the court, counsel. People argue that the trial judge erred in granting the defendant's motion to suppress evidence. Key issues in this case are, first, whether the trial judge misinterpreted Section 11-501.2 and incorrectly denied admission of defendant's refusal to submit to post-arrest breath testing into the evidence, and second, whether the trial judge's finding that Officer Vanderman did not properly perform the field sobriety test was against the manifest weight of the evidence. At the motion to suppress hearing, Vanderman testified that he asked the defendant to provide a breath sample after he had arrested him for DUI. Defendant's counsel objected to questioning about defendant's post-arrest refusal of a breath test. The prosecutor argued that evidence of such refusal was admissible under Section 11-501.2c, but the trial judge sustained defendant's objection based on her interpretation that under the statute, evidence of defendant's refusal to test was not admissible because it occurred after the DUI arrest. Section 11-501.2c1 of the vehicle code states that if a person under arrest for DUI refuses to submit to chemical test under the provisions of Section 11-501.1, which is the implied consent statute, then evidence of the person's refusal shall be admissible in any civil or criminal action or proceeding. His brief, defendant notes that both Sections 11-501.1a and Section 11-502.2c2 state that if a law enforcement officer has probable cause to believe that a motor vehicle is being driven by a person under the influence, the officer shall request and the person shall submit to testing to determine the driver's blood alcohol content. Under those two statutes, the officer makes the determination at the scene whether under the known facts a reasonable person would believe that the driver was under the influence of alcohol. The objective facts known to the officer prior to the field sobriety testing were sufficient to show probable cause to arrest defendant for DUI. Defendant had a single car rollover accident on a dry road on a clear night. Defendant admitted that he had drunk three to four beers in the evening prior to the accident. Defendant admitted that he had been driving too fast and lost control on a curb, which shows that his judgment likely was impaired. Defendant had the odor of alcohol in his breath, his eyes were bloodshot, and his pupils were heavily dilated and defendant swayed. It was not disputed that these objective facts were known by the officer prior to the arrest and the trial judge noted that officer Bienemann had testified to these particular facts. The field sobriety tests were additional evidence that were supporting that Bienemann had probable cause to arrest defendant for DUI. The record shows that Bienemann arrested defendant for DUI before asking him to take the breath test. Therefore, section 11-501.2 applied in this case. The trial judge's refusal to admit the evidence of defendant's refusal of breath testing on the ground that this occurred after defendant's arrest was contrary to the plain language of section 501.2c1. Therefore, the trial judge ruled incorrectly as a matter of law that evidence of defendant's post-arrest refusal to take the breath testing was not admissible in the motion to suppress hearing. In his brief, defendant notes that the Garriott case the people relied on did not involve a probable cause issue but Garriott held that an officer could request testing after arresting the defendant for DUI even if section 11-501.2 did not apply and testing was not required. In that case, the defendant was not on a public highway he was on private property so there was no requirement that he submit in that issue. The Garriott court said that the defendant's refusal of testing upon request should not be suppressed. I know you said that the results of the other preliminary tests gave the probable cause and this just confirmed it but don't we have some problem because the judge found that the field sobriety test didn't comply with those standards and that he had not properly conducted some of them so the trial court found that there wasn't a probable cause established by the pre-arrest procedures so then can you use the refusal in that circumstance? Even if you leave out we're not submitting that the field sobriety tests were bad our second issue was that she erred in that but if you take just the testimony his observations, the officer's observations of the defendant and the odor of alcohol, his admission to drinking his speed on the curb was too great he flipped the car, the bloodshot eyes the pupils and his swaying those are all indicators of intoxication and impairment so that gave him probable cause to arrest him for DUI just on that alone the field sobriety testing was additional evidence that sort of sealed the deal if you will regarding the probable cause. We do notice that in his brief the defendant argues for the first time on appeal that officer Bienemann engaged in misconduct and the evidence should be excluded on that ground but people noted in our brief that no one had claimed below that Bienemann had engaged in misconduct and that the exclusionary rule for that reason did not apply and this court should not, or rather should reject the defendant's newly raised argument that it was not raised below or considered by the trial judge we next argue that it was the trial judge's finding that Bienemann did not properly perform the field sobriety testing was against the manifest weight of the evidence and ruling on the defendant's motion expressive trial judge stated that of particular importance to her was that officer Bienemann had only one and a half years of law enforcement experience and that this was his first DUI arrest these particular facts do not have any bearing on whether Bienemann properly conducted the field sobriety test the trial judge also had issues with officer's credibility due to his lack of experience the fact that an officer is inexperienced again does not make him not credible regarding the HDN test the judge did not believe that officer Bienemann had met the NHTSA standards but Bienemann testified that he administered the test according to the NHTSA protocols but he admitted he did not ask the defendant if he understood the instructions Bienemann testified that the defendant exhibited all six clues for impairment on the HDN where the defendant lacked smooth pursuit in both eyes he had distinct and sustained nystagmus and the defendant had the onset of nystagmus prior to 45 degrees in both eyes the trial judge reviewed the videotape of the sobriety test and all three tests were on that videotape and this court of course can make its own assessment of that video because the trial judge was in no better position to do so than this court in terms of the review of the video and the video does not show a defendant's eyes during the HDN testing but it appears to show that Bienemann performed the test properly the trial judge noted that Bienemann testified that the HDN test could be used to show impairment and the trial judge ruled that that's clearly in violation of the standards set forth in McCown but the McCown 1 court there were two McCown cases back on the Supreme Court. The first one stated that the officer looks for six nystagmus clues, three in each eye that according to the NHTSA manual indicate impairment. If four or more clues are present the subject is determined to have failed the test and be impaired. The McCown 2 court stated any evidence of alcohol consumption is relevant to the question of impairment a failed HDN test is relevant to impairment and the court held that evidence of HDN test results is admissible for the purpose of proving that a defendant may have consumed alcohol and may as a result be impaired. Therefore the trial judge erred and it was a matter of law when finding that the HDN test could not be used to show impairment. Regarding the one leg stand test the trial judge found that Bienemann did not completely or thoroughly instruct the defendant and the judge found that Bienemann erred in instructing the defendant to point down with his heel and she found that Bienemann had demonstrated with his heel. Bienemann acknowledged that he told the defendant to point his heel outward but Bienemann said that he administered the test according to the NHTSA manual and the video itself shows that he properly demonstrated the one leg stand. Bienemann's verbal instructions regarding pointing the heel were harmless error. The video shows that the defendant could not keep the one leg off the ground, he raised his arms for balance and he swayed heavily from side to side. The defendant also did not use the 1-1000 method of counting that he had specifically been instructed to use. He put his foot back down at 4 seconds or the 4th count in and also in the 16th count on and Bienemann eventually stopped the test at the 20th count because the defendant clearly could not keep his foot off the ground for the full 30 seconds. And regarding Bienemann's testimony in the walking turn test the trial judge noted that he had difficulty recalling all the clues for that particular test. But Bienemann's difficulty in recalling all the clues during this testimony does not show that he conducted the test improperly. The video shows that the defendant did not follow Bienemann's instructions for the walking turn test. He did not stand positioned during the instruction phase as he had been directed to do. He started on the wrong foot and counted the initial placement of his right foot and the front of his left foot as the first step. He raised his arms to steady himself and he turned in the wrong direction at the end of the 9 steps. And during the return walk the defendant could not stay on the imaginary line and during the last 5 steps he couldn't even put his heel to toe. He kept walking just fairly normally at that point, kind of staggered off to the right during that test. The trial judge's rejection of the results of the field sobriety test was error. And people asked this court to reverse the trial judge's grant of the motion to express evidence. We'll stand on our brief for all other arguments. Thank you counsel. This case involves a single car accident that took place on the evening of October 25, 2015. As previously stated by counsel there are two issues basically that are the primary issues that come before the court. As far as the trial court erred in granting the motion to suppress the defendant and in doing that the trial court erred in refusing to admit post-arrest testing or asking for testing and it took place post-arrest and the judge did determine that the field sobriety tests were not done properly or refused to recognize those tests. Now in this case, this was a two separate days for this hearing. The trial court was there. She was the one that got to observe what was taking place. As the court knows the trial court is in the best position to judge the trial court is actually there watching, observing, listening and to what's taking place. The problem with Officer Dienemann in this case was not just that he was new. It came out, it was very clear that he had been on for a year and a half. He barely was on his own. This was his first DUI investigation. But it was also just his demeanor that was going on there with the judges observing and I'll get to what her finding was on that. But when you get into the testimony of what took place, what he's observing, he makes the comment that he's observing red bloodshot eyes. And he uses that as an indication of impairment but he makes no other inquiry. He testifies during the hearing that it can be caused, many things can cause red bloodshot eyes. And he assumed only that those red bloodshot eyes came from consumption of alcohol. Nothing else. And what's more important to note here judges is that in this case, this is a rollover accident. First of all he assumed that somebody else was driving. Mike Klein actually had to say I was driving. But he observes abnormally dilated pupils in this case. And it's noted and it came out. But he indicates that he thinks that that is an indication of somebody drinking. And so it was brought out. Well, when you notice that these pupils are abnormally dilated, did you consider bringing somebody else with more experience over and maybe getting him medical attention because this is a sign of head trauma. He didn't. He didn't ask for anybody else. He went on his own. And he just assumed that that was because of alcohol, which is a bad assumption in this case. So everything he's doing is assuming what's taking place. And he's assuming everything in the negative that it all has to be from alcohol. He does no investigation. Now, counsels argue that there was an accident here. There was. And the officer assumed it was because of speed. Because he found nothing else. And he did no investigation. And under his own testimony, did you investigate this? Slightly. He just assumed that he was going too fast. Nothing else. And when he talked to my client, my client really didn't remember much about what happened, which again would show an objectively reasonable officer and a well-trained officer that maybe there's something going on with some head trauma here that I need to further investigate. But he didn't do that. He instead takes him right into field sobriety tests. And so what did we get from the field sobriety tests? We got the NITSA standards. And he testified, and it was taken of the 2006 manual, which is one he was trained under, that any variation of the standards in the NITSA manual would lead to false conclusions. You can't vary from these. These are standardized tests. And he said that he knew he was trained that these were standardized. He just followed the rules in order to get any conclusions. You can't vary from that. But he did. And so when we get into the horizontal gaze astigmatism test, he didn't even know what it was called. It's the eye test. I'm looking for the eyes to, the unmoving of the eyes. That's his version. He's looking for the unmoving of the eyes. That's how he's describing this to the court. And he says it indicates impairment in the eyes. And I said, I asked him, are there many things that can cause this? Yeah, I guess. So it's all nonchalant to him. He doesn't really care about the standards that are in place. And when it came to asking about this, and aren't there people, don't you have to ask people, can they do the test? He's like, and this is on cross when the prosecutor is asking him, did you ask him? He said, yeah, I asked him about, could they do the test, blah, blah, blah, blah. That's his philosophy. This is what the judge is observing. How he's going to handle these standardized tests. He could care less about the standards. It's just, I'm here, I'm going to do what I want. And that's what he puts out there. So if you look on the HGM, the HGM test, he doesn't know how to do it. Even when he watched it on video, he goes, well, I think I got the two-second pass right. So he's admitting he didn't do the test right. The test lasted for less than 20 seconds. As the court's more aware, if you're going to do a proper HGM test, it has to last less than 20 seconds if you're going to do all the testing by the proper standards. 20 seconds doesn't cut it. The court took notice of that. And what's taking place here? On the one-leg stand, he admits that he didn't know, verbatim, how to explain the test to my client. He admitted that he gave the wrong test as far as how you're supposed to perform the test. He admitted he made a couple violations there of the standards. But yet, the counsel wants to argue that these tests should be counted. He's already said, I violated protocol on these tests. I said, do it this way, but demonstrated to do it this way. So he didn't even tell my client to keep his foot off the ground for 30 seconds. He didn't do anything to demonstrate the test. He didn't even ask him, could he do the test? He didn't take that into consideration. I asked him, are there certain people who can't do this test? He said, well, paraplegics and if you don't have any legs, amputees. That was who he thought couldn't do this test. That's, again, his philosophy for doing these tests. Well, I had him read it then and he did find out that people over 65 years of age should be considered as not being able to do this test because, as you know, there's many people who just can't do them anyway. But he didn't know that. And when I asked him on the one legs or the walk and turn test about that, his comment was, well, I'm sure you're going to show me. But he goes, I don't know when I asked about people who can't do this test. So, again, he didn't even take that into consideration. Who can and can't do this test? I didn't ask him if he understood the test. And then he's trying to count things against my client during the test. When I asked him on the HDN, I said, how many clues are there? Could you score this test? He goes, no, it's a pass fail. There are no scores. Which, as you know, is wrong. There are six clues. It takes four to fail the test. He didn't even know that. So, again, he's demonstrating. Under McCowan, if you can't articulate what's going on with the test, that's the first standard. Can the officer even articulate that he knows how to do the test? If they can't do that, the court can look at that and assess that this person is not qualified to do this test. And you can just count the test, which is what the court did. I asked the court, then, once all this was done, I said, I would like you to consider that he did not meet the standards of McCowan and discard this test, which eventually the court did. So on the walk and turn, he admits to a violation, two violations of the NSSA standards on the One Lake stand. So the court, noting that, discounted that test. That's not an error on the court's part. She's observing this. She's watching this. She's watching an officer who's never done a DUI investigation in his life, now trying to do it and just doing it at will. He doesn't want to read from a manual. He doesn't want to do what he was taught. He's just winging it and messing it up. He's not even telling the right test to do. So that's not an error on the court's part when you're obviously watching this officer fail to do this test properly, admitting he's violating NSSA standards to disregard the test. And then we get into the walk and turn test. He admitted he didn't ask me if he understood the test before giving it to him, even though he was trained to do so. He admitted at no point did he tell my client to stay in any position during the instructional phase, although he scored him for not staying in position. So he gave him one point for not staying in position, but never told him to stay there. So again, how is my client supposed to know what to do when he's not even told to do it? And it was painful watching this and watching him try to answer these questions when you watch the video because it's important. Before I played the video, I asked him, did he do these things? And he said, yes, I did tell him. I told him this and I asked him if he understood. I played the video. Officer, did you tell him? Well, no, I didn't. I didn't ask him if he understood. So credibility becomes an issue to the judge at that point because he's saying one thing that he did, but she's witnessing another thing. So it becomes a credibility issue, not just because he's young and inexperienced, but because he's changing his testimony once he's confronted with evidence. So that becomes a problem for the judge. He's trying to note things after watching the video that he didn't observe when he was doing the test. And I ask him, would you put all of these things into your police report if you observed them? Yes. But they're not in there. So he tries to go back and say, well, I saw this. And he admitted he didn't watch the video before he came to the hearing even though it was available to him. So, again, you've got problems with consistency here. And it gets down to what probable cause did he use, in his mind, to arrest my client? And he said he testified that following the walk and turn test, it included everything he used to determine what he was going to use. So it was red bloodshot eyes, smell of an alcoholic beverage, and failing to fill sobriety tests. I asked him about the smell of an alcoholic beverage. Is that an indicator of intoxication? At first he said it wasn't. Then when he came back to testify, suddenly he said it was. And I said, well, how can you quantify that? Isn't it true that there's no way to tell how much somebody's had to drink based upon the smell of an alcoholic beverage? And he goes, well, yeah. I go, so what standard did you use to apply this? I didn't. He just made it up. There was never any training he had to get to that conclusion. And it was unrefuted in this case that my client, over a course of seven hours for the evening, had consumed possibly three to four beers, over seven hours. So we're not talking about consuming a lot of alcoholic beverages in a short amount of time. That was just stated. This was seven hours, three to four beers. And so we're not talking about over a short amount of time, which was just talked about earlier. He even said, being at first when I asked him, I said, is having a wreck in a vehicle an indicator of intoxication? He first testified it was not. And the prosecutor asked him, then he said it was. So we've got conflicting testimony again as to that. Thank you. So when we talk about what the judge found and how she found Mr. Bieneman to be in this case, her observations were pretty clear about what she thought about him. And it wasn't just about his age. The court said, as to his credibility, I find quite honestly both times I heard the officer testify, I believe due to his lack of experience and the court really had some concerns about his credibility in this case. He had a very poor attitude. In fact, I would say on the record, I think he was probably the poorest attitude I've seen in a law enforcement officer since I've been on the bench. That's not a guess. That's two times seeing this officer. So when you take all that into account, she didn't err in granting the motion to suppress. She didn't err in the field sobriety test and very quickly on the allowing or disallowing post-arrest testing to come in. That case was decided in Boomer that unless there's probable cause, you can't bring that in. The officer must have probable cause under C2 in order to bring in that information. In this case, the court rightfully found there's no probable cause for arrest. You can't bring in post-arrest information to try to rehabilitate the officer's testimony or anything else. And so that has been decided. That's not an issue at this point. The court has already looked at that issue and decided that it doesn't come in when the lax probable cause. So you were right in your assessment of that. And I would rest on the rest of my writing as far as the other issues in this case. We would ask you to affirm the court's decision in this matter. Thank you for your time. Counsel mentioned that there were more experienced officers on the scene but there is no requirement that a younger officer necessarily ask those officers for assistance. He may have felt that he had sufficient training that he could handle with EUI. He wanted to make this effort on his own without going to these more experienced officers. Defendant refused medical treatment. Counsel didn't mention that. That was something that was being testified to. When Beeman was being cross-examined by the prosecutor about the question where the audio was off, what was the meaning of blah, blah, blah? I can't actually determine what that blah, blah, blah meant. Obviously he had some attitude when he was testifying. We're not going to discount that at all. It was not the best one could ask for. I can't begin to tell you what he was really trying to... He was being flippant. That's the best I could say. Defendant did tell Officer Beeman that he had been driving too fast. That was something that was put into the record. People acknowledge that Beeman made some instructional errors on the field sobriety test. We've never discounted that at all. But when you look at that video, you hear the instructions given and you see that he absolutely... The HDN is hard to determine. It's shot from the side. You really can't determine. You could count your own seconds up to tell how long the test lasted. For the one-leg stand and the walk-and-turn test, the defendant absolutely could not perform those tests. There's just no way in the world. If you listen to the instructions that were given, for instance on the walk-and-turn test, he did tell him to stay in position until he had demonstrated. But the defendant didn't stay in position. He just stood loosely instead of staying in the position that he was originally directed to stay in. Things like that. Regarding the unmoving eyes, the officer did testify to that initially, but he also later stated that the correct standard was that the eyes were jerking uncontrollably and he described the correct procedure under the HDN process. The video... I'm sorry. I'm just reviewing my notes here. Regarding the timeframe in which the defendant consumed the beers, we know that roughly there was a timeframe from about 5.30 when approximately that time they went to dinner and they went to a concert and the accident happened somewhere between approximately 12.30, something like that. But we have no evidence other than, I believe, his wife testified that he may have had a beer at dinner, but she didn't give a timeframe when he drank the other beers and she wasn't even sure about whether it was 2, 3, 4 beers. She thought it was 3 or 4 and she herself had been drinking. And, of course, this is his wife. Credibility is an issue when you've got a spouse testifying. Going back to that credibility, isn't that part of the problem with these sobriety tests is that he testified that he gave these instructions right and then when the video was shown he was like, well, yeah, maybe I didn't do... So the judge specifically finds that it isn't just his experience, but based on his testimony, she finds that there's a credibility problem regarding his testimony with these field sobriety tests. And he said he'd give the instructions and then he said, well, I guess I didn't give them correct. I did two things wrong on the one leg stand test. But he doesn't say any of that until after the video. He testifies to all these things that he did right then so that he's impeached with what happened on the video. Then he says, okay, I didn't do this right or do that. He got out of position before he started, but I don't think he ever told them what the right position was. You know, kind of those things that he tells two different stories almost on each one of the tests and then at the end the judge says, you know, I just want to make this very clear that I'm finding really that he's not credible. I think she said for clarification or something, I want to make it very clear that it wasn't just his lack of experience or something. And so she's making a determination that she doesn't believe his testimony about the instructions and the things that he gave. Right? She relied heavily on the experience aspect of it, but she also thought his attitude was poor. I believe the words were to the effect that he was the worst witness she had ever seen. She says here, just for clarification, if it wasn't clearly stated, the court not only took into consideration the defendant, the officer's lack of experience, but quite honestly, his credibility was called into question as it related to his testimony about the investigation that was conducted at the scene with respect to the accident as well as the way he conducted the field sobriety test. I mean, I don't think there's any question that she was focused on both aspects and perhaps even more on the credibility than the experience. No, I don't discount that. I believe that's in our brief too. At least we tried to put in as much as possible, certainly not trying to hide that aspect of the judge's ruling. Again, he was not the best witness. He did waffle, but the video is your best objective evidence that you have. If you watch that video, you see the instructions that were given, you hear the instructions that were given, and you see that the defendant absolutely could not perform the walk and turn test or the one leg stand test. If he had given pristine instructions, he still would have failed those tests. And that's just clear on the video. And of course, the actual signs that the defendant was saying that he drove too fast. Well, maybe that's not by itself an intoxication. I've heard that probably every day. But he had a rollover accident. He refused medical treatment. I believe there were four people, including the defendant in the vehicle. All of them refused treatment. He did have a bruise on his side, as I recall. They had a photo of that, but there was no bruise on his head or anything He did not point that he had a head injury of any kind. Those kind of things. He had the bloodshot eyes. And of course, any good counsel will say, well, those could be because you had allergies or you had dust in your eyes or any other kind of factor. But you have to consider all these things together. And those create a probable cause. The dilated eyes, the admission to drinking, the smell of alcohol, the bloodshot eyes, the swaying as you're standing to the officer. That's all probable cause. Thank you, counsel. The court will take this matter under advisement and render a decision in the near future. And we will now adjourn until the next court hearing.